UNITED STATES of America, Plaintiff,

v.

Henry ANDREWS, George Carter and William Doyle, Defendants.

No. 89 CR 908–1–5–12.

United States District Court, N.D. Illinois, E.D.

June 14, 1993.

1274

Barry Rand Elden, Asst. U.S. Atty., Chicago, IL, for plaintiff.

Gary Ravitz, Chicago, IL, for Henry Andrews.

Peter J. Schmiedel, Chicago, IL, for George Carter.

Marianne Jackson, Chicago, IL, for William Doyle.

## MEMORANDUM OPINION AND ORDER

CONLON, District Judge.

### INTRODUCTION

This court presided over the severed trial of an indictment relating to the El Rukn organization, a Chicago street gang. In 1989, an unwieldy 305–page, 175–count indictment was returned against 38 El Rukn "generals," "ambassadors," and "officers." The original indictment charged more than 250 factually separate criminal acts over a 23–year period. In a thoughtful and carefully considered opinion, Judge Marvin E. Aspen severed the case into five trials. *United States v. Andrews,* 754 F.Supp. 1161, *modified,* 754 F.Supp. 1197 (N.D.Ill.1990). This court was reassigned severed charges against five defendants: Henry Andrews, George Carter, William Doyle, J.L. Houston and Derrick Porter. The El Rukn trial conducted by this court was designated as "Trial Two." *Id.* at 1203.

Trial Two involved charges against all five severed defendants for conspiracy to conduct the affairs of the El Rukn organization and its predecessor gangs through a pattern of racketeering, in violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d) [Count One, consisting of 53 pages]; conducting the affairs of the El Rukn organization through a pattern of racketeering activity and committing 64 predicate acts, in violation of 18 U.S.C. § 1962(c) [Count Two]; and engaging in a narcotics conspiracy, in violation of 21 U.S.C. § 846 [Count Three]. In addition, Derrick Porter was charged with obstruction of justice by planning the murder of an El Rukn who was a government informant, in violation of 18 U.S.C. § 1503 [Count Sixteen], and George Carter was charged with distribution of .36 grams of cocaine, in violation of 21 U.S.C. § 841(a)(1) [Count Eighteen].[1]

The core RICO conspiracy and substantive RICO charges against the Trial Two defendants pertained to their alleged direct participation in murder conspiracies, and in related murders and attempted murders of rival gang members and witnesses who were to testify against El Rukn members in several state prosecutions. The RICO charges also incorporated drug activities repeated in the drug conspiracy count. The government's case essentially rested on the testimony of former El Rukn leaders who themselves were admitted murderers and drug dealers implicated in the same charges.[2] The critical government witnesses were Earl Hawkins, Harry Evans, Jackie Clay, Eugene Hunter, Ervin Lee, Henry Harris and Derrick Kees (collectively, "the El Rukn inmate witnesses"). There was little independent evidence corroborating the testimony of the El Rukn inmate witnesses. Recorded telephone conversations in which William Doyle participated were received in evidence. The conversations were in code; the code was "translated" by El Rukn inmate witnesses.

Each El Rukn inmate witness admitted to an extensive history of violent criminal activity and drug trafficking. Each also testified that all benefits and promises he had received from the government in exchange for his cooperation were embodied in a written plea agreement described in some detail to the jury. Before and during trial, the prosecution never disclosed that any El Rukn inmate witness received benefits or special favors other than those specified in the plea agreement.

The El Rukn inmate witnesses testified implicitly that their criminal activities ended when they started cooperating with the government. *E.g.,* Tr. 5263, C. 595 (Harris); Tr. 3732 (Evans); Tr. 4528 (Kees).[3] Before and

---

1. Two superseding indictments were later returned, resulting in the renumbering of some counts and predicate acts.

2. Only the evidence against George Carter with respect to the drug transaction alleged in Count Eighteen was not based on the testimony of cooperating El Rukn leaders. This drug offense was evidenced by a taped conversation. In his closing argument, Carter's attorney conceded the drug sale, but argued that the transaction was

not part of the drug conspiracy or pattern of racketeering alleged in the indictment. Tr. 6113, 6118–19. In fact, defense counsel acknowledged that Carter had pleaded guilty to the same drug sale in state court. Tr. 6119.

3. "Tr." refers to the transcript of Trial Two proceedings. "C." refers to the transcript of the hearing before this court on defendants' post-trial motion. "H." designates the transcript of Judge James F. Holderman's post-trial hearing.

during trial, the prosecution never disclosed that its witnesses had engaged in any misconduct or had been disciplined during confinement in protective custody as cooperating government witnesses.

The El Rukn inmate witnesses testified that they had not discussed their testimony with each other; several of the El Rukn inmate witnesses affirmatively denied that they had any contact or opportunity to communicate with other El Rukn witnesses. Before and during trial, the prosecution never disclosed that the El Rukn inmate witnesses had access to documents (including internal prosecution memoranda) relating to the testimony of other El Rukns, as well as extensive opportunities for contact with one another at the Chicago Metropolitan Correctional Center ("the MCC") and in the offices of the United States Attorney and the Bureau of Alcohol, Tobacco and Firearms ("ATF").

Just as the prosecution's case was built on the testimony of the El Rukn inmate witnesses, the defense strategy hinged on attacking the credibility and reliability of that testimony. Each of the El Rukn witnesses was cross-examined extensively concerning his criminal record, his own exposure in this case, and his self-interest in fabricating or exaggerating the conduct of the defendants on trial. These were central themes in the closing arguments. The prosecution emphasized that the El Rukn inmate witnesses corroborated each others' testimony, that they started cooperating at different times and under different circumstances, and that their information was not subject to mutual influence or collusion. Defense counsel responded that the testimony of the El Rukn witnesses was not reliable or worthy of belief.

After deliberating several days, on August 29, 1991 the jury returned their verdicts: William Doyle was found guilty on Counts One, Two (Racketeering Acts 5, 6, 9, 13, 15, 16, 31, 32, 33), and Three; George Carter was found guilty on Counts One, Two (Racketeering Acts 5, 31, 34), Three and Eighteen; and Henry Andrews was found guilty on

Counts One, Two (Racketeering Acts 5, 31) and Three.[4]

Sentencing was substantially delayed due to the government's failure to submit its version of the offense to the probation office for preparation of the presentence investigation report ("the PSI"). Without the benefit of the government's version, the original PSI did not apply the sentencing guidelines, effective November 1, 1987, to this case. However, after conferring with prosecutors several days before the scheduled sentencing hearing, the probation office issued a substantially different "corrected" PSI applying the sentencing guidelines. The probation office did not afford the defense an opportunity to address the complex issues of fact and law raised by the prosecution on the eve of sentencing. *See* Memorandum Opinion and Order issued May 5, 1992, 1992 WL 100928. After striking the "corrected" PSI, the court gave the parties a full opportunity to brief the new sentencing issues.

Following the court's resolution of the threshold sentencing issues in the government's favor, on May 18, 1992 the defendants filed this joint motion to vacate their judgments of conviction and to dismiss or, in the alternative, for a new trial ("defendants' post-trial motion") based on allegations of newly discovered government misconduct. The defendants' motion was predicated on information received from a defense attorney in a related case involving other El Rukn members, *United States v. Burnside*, 89 CR 909 (Judge James F. Holderman, presiding). The motion alleged that Henry Harris, a key El Rukn witness, had been disciplined for a drug infraction at the MCC several months before Trial Two. Defendants' motion further alleged that Harris had made a statement to MCC officials, that "he used heroin to conceal his role as an informant in a secret drug investigation of [other MCC] inmates." Defendants' Post–Trial Motion at 5. Defendants requested a hearing and "that the prosecution be directed to tender to the defense all *Giglio, Brady,* and § 3500 material

4. Early in the trial, the court granted J.L. Houston's motion for a mistrial and severance. At the close of all the evidence, the court granted Derrick Porter's motion for judgment of acquittal.

not heretofore produced." *Id.* at 9.[5] The prosecutors responded by denying they had failed to turn over *Brady* and *Giglio* material, that they were unaware of Harris' heroin use at the MCC or a resulting disciplinary hearing, that defense counsel failed to exercise reasonable diligence in obtaining this information earlier, and that defendants' motion "must" be denied without a hearing. Government's Response at 1, 27. Nevertheless, this court ordered a hearing to resolve serious factual issues raised by the defendants' post-trial motion and the government's response, as did Judge Holderman in the *Burnside* case.[6]

This court's hearing on defendants' post-trial motions did not begin until October 15, 1992, due to continual delays at the government's behest. A number of sessions were held over the following two months because of the piecemeal disclosure of information responsive to the defendants' Trial Two subpoenas served on August 9, 1991, and to defendants' post-trial hearing subpoenas returnable on September 19, 1992, as well as basic *Brady* and *Giglio* material.[7]

At the United States Attorney's request, the Department of Justice provided funds for the lead El Rukn prosecutor, Assistant United States Attorney ("AUSA") William Hogan to retain his own attorney for these proceedings. In addition, two of AUSA Hogan's paralegal assistants, Corinda Luchetta (a licensed Illinois attorney) and Tanya Van Blake, were granted immunity from prosecution, as well as Department of Justice funds for retaining their own private attorneys.

During the protracted hearing, remarkable credibility issues were raised when present and former employees of the United States Attorney's office and various cooperating government witnesses gave conflicting testimony. The hearing revealed that substantial evidence reflecting adversely on the reliability and biases of the El Rukn inmate witnesses was not disclosed to defense counsel before or during Trial Two: drug use while in custody as protected government witnesses; disciplinary actions and non-enforcement of disciplinary measures; failure to conduct routine drug testing after October 1989; permissive and lax security measures, giving El Rukn inmate witnesses access to internal prosecution memoranda, drugs, sex and unlimited free telephone calls; and various gifts, including cash, clothing, "walkman" radios, food, cigarettes and beer. Some of the evidence presented went beyond the fundamental issues raised by the defendants' post-trial motions. The court enters the following findings of fact and conclusions of law on the issues deemed necessary to resolve the defendants' motion.

### FINDINGS OF FACT

**I. Noncompliance With The Defense Trial Subpoenas For Drug Testing And Disciplinary Records**

■ 1. On August 9, 1991, defendants served two trial subpoenas on the MCC for drug testing dates and results regarding the El Rukn inmate witnesses, and for all records pertaining to disciplinary matters for the El Rukn witnesses during the period they were in protective custody cooperating with the government; the subpoenas specifically included drug testing and disciplinary

---

5. Defendants' request referred to material the government must disclose under the due process clause of the United States Constitution. *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

6. This court has reviewed the transcripts of the *Burnside* post-trial hearing and Judge Holderman's comprehensive memorandum opinion and order issued on June 4, 1993, 824 F.Supp. 1215 (N.D.Ill.), granting the *Burnside* defendants' motion for a new trial. Except where credibility is not contested, however, the findings of fact in this memorandum opinion are based solely on the testimony, stipulations and exhibits received

in the *Andrews* case, and this court's independent resolution of underlying credibility issues.

7. The government's chronic failure to timely produce *Brady* and *Giglio* materials during the course of Trial Two and the post-trial hearing is too extensive to recount here. For example, on March 31, 1993, two months after this hearing concluded, the government produced "additional discovery" regarding previously undisclosed benefits bestowed on the El Rukn witnesses in *1991.* These items included $174 in clothing that paralegal Corinda Luchetta purchased for Henry Harris and "walkman" radios ATF agents purchased for Earl Hawkins and Harry Evans.

records pertaining to Harry Evans and Henry Harris.   DX Subpoena 1.[8]

2.   When served with the subpoenas, Charvella Christmas, the MCC paralegal designated by the warden to respond to subpoenas, informed defense counsel that she had no intention of complying and that the subpoenas should be discussed with the United States Attorney.   Tr. 5535.

3.   The MCC trial subpoenas were returnable on August 13, 1991 at 9:00 a.m.; no one from the MCC appeared nor were any MCC records produced that day.   Defense counsel brought this situation to the court's attention early on August 14, 1991.   *Id.*

4.   The following exchange then occurred between the court and AUSA Hogan:

> MR. HOGAN: I talked to Miss Christmas. . . . She says that all those records are protected by the Freedom of Information Act, which the defendants have not complied with the requirements, and many of them are privileged.
>
> THE COURT: This is a trial subpoena.
>
> MR. HOGAN: Right.

Tr. 5535–36.

5.   Just before lunch the same morning, the court raised the issue again with government counsel:

> THE COURT: I've been thinking about that, I'm really surprised that somebody over at the MCC just ignored a subpoena.   What I would suggest is you call [Ms. Christmas] and explain I'm going to issue a rule to show cause.   I hate to do that on the MCC.   I can't imagine that they'd just ignore a subpoena from the Court, but that's where [sic] I'll be left to do if she doesn't appear this afternoon.   In fact, why don't you ask her to be here at about 1:25.   I would like to talk to her.

Tr. 5585.

6.   In addition, the court's clerk called Ms. Christmas directly and asked her to come to court with the records that afternoon; Ms.

Christmas informed the clerk that she had not responded to the subpoenas because the United States Attorney had not authorized her to do so.   Tr. 5610–11.

7.   Ms. Christmas appeared in court later that afternoon accompanied by AUSA Linda Wawzenski.   Ms. Christmas did not produce any documents.   She represented to the court that a manual check of monthly logs would be required to locate drug testing dates and results and that authorization "from Washington" was needed before information about the El Rukn witnesses could be released.   Tr. 5626–27.   Ms. Christmas also represented that disciplinary files for the El Rukn witnesses could not be disclosed without authorization and that the records would not be at the MCC; she stated that records for the El Rukn witnesses would be maintained at the institutions where the witnesses were designated.   Tr. 5627.

8.   AUSA Wawzenski stated that she thought authorization for disclosure could be obtained by the following morning (August 15), but she reiterated that she doubted there would be any disciplinary records for the El Rukn witnesses located at the MCC; however, Ms. Wawzenski stated that MCC drug testing records could be produced within several days.   Tr. 5628.   Defense counsel offered to narrow the time frame covered by the subpoenas to expedite the search.   Tr. 5630.

9.   The court instructed Ms. Christmas to return the following morning with whatever records she was able to find.   Tr. 5629.   Ms. Christmas responded that she would look for drug testing records, but that " . . . as far as the disciplinary is concerned, that information is not going to be at the Metropolitan Correctional Center."   Tr. 5631.   Nevertheless, the court then directed Ms. Christmas *twice* to conduct a search for disciplinary records.   *Id.*

10.   The following morning, Ms. Christmas returned to court with one disciplinary

---

**8.** "DX" and "GX" refer respectively to defendants' and the government's post-trial hearing exhibits.   The parties used proper names or generic source designations, as well as numbers to identify their exhibits.   Thus, organization and retrieval of trial and hearing exhibits have been a cumbersome undertaking, particularly given the piecemeal manner in which exhibits were produced.

file relating to a single unidentified El Rukn witness; AUSA Wawzenski requested an hour to redact information identifying the institution where the witness was disciplined. Tr. 5694. The trial record does not contain any further reference to the unidentified disciplinary record. From the context of AUSA Wawzenski's redaction request, the court infers that the disciplinary incident reflected in the unidentified record did not occur at the MCC.

11. Ms. Christmas produced a memorandum dated that day, August 15, 1991, from MCC Special Investigation Supervisor Charles Mildner regarding drug tests on El Rukn witnesses. DX Christmas 1. The memorandum reflected that Harry Evans tested positive twice for codeine and morphine and Henry Harris tested positive once for morphine during April and May 1989. *Id.* No other records relating to drug testing were produced; no records whatsoever pertaining to discipline were produced.

12. The court admitted DX Christmas 1 (identified at trial as DX MCC–2) into evidence, over the government's objection that this document, prepared and produced by the MCC's designated custodian of records and an Assistant United States Attorney in response to defendants' trial subpoena, lacked an adequate foundation. Tr. 5702.

13. The government also objected on the ground that admission of the drug test results would create a "frolicking detour" because MCC representatives purportedly advised the prosecutors that the positive drug tests were just the result of medication. Tr. 5696–99.

14. The drug test results received in evidence as DX MCC–2, prepared by Mildner on August 15, 1991 in response to defendants' trial subpoenas, did not include any information as to whether Harris' and Evans' positive tests were authorized by medication. DX Christmas 1; C. 461–62. However, two years earlier Mildner had prepared a memorandum for the MCC warden that included the same drug test results reflected in DX MCC–2. DX 21. In his 1989 memorandum,

Mildner specified whether or not positive drug tests were medically authorized. *Id.* Mildner reported that Harris' positive test for morphine on May 11, 1989 was *not* medically authorized; Evans' positive test for morphine on April 12, 1989 was *not* medically authorized, but his positive test for morphine on May 10, 1989 was authorized. *Id.*[9]

15. In December 1988, MCC Warden Art Beeler gave Associate Warden Max Nuss a written directive instituting a policy of informing Assistant United States Attorneys about all positive drug tests on pretrial inmates; Beeler expected his policy directive to be obeyed. C. 366–67, 374–76.

16. In July 1989, MCC executive personnel were concerned how the El Rukn witnesses on the sixth floor (where Evans and Harris were housed) were obtaining drugs. C. 391, 398.

17. Under Warden Beeler's policy directive, AUSA Hogan would have been informed of drug use by the El Rukn inmate witnesses. C. 376–77, 390, 403.

18. MCC Warden Beeler delivered a copy of Mildner's memorandum (DX 21) showing that Evans and Harris had tested positive for unauthorized drugs to Acting United States Attorney Ira Raphaelson's office in October 1989. C. 370, 415–16, 419–20, 704–05. Ira Raphaelson testified that based on his routine practices, he would have directed DX 21 to AUSAs Hogan and Larry Rosenthal who were supervising cases involving El Rukn inmate witnesses. H. 1142.

19. On October 17, 1989, Warden Beeler and Special Investigation Supervisor Mildner met with Acting United States Attorney Raphaelson concerning the drug problem on the sixth floor and the need for a non-contact visiting room. C. 415–16, 418–19, 420–21.

20. Contact visits are considered by the MCC as a breach of security because of the opportunity afforded to pass drugs or other contraband. C. 492–93.

21. A month before the meeting with Raphaelson, a MCC correctional officer sent

---

9. Mildner's post-trial testimony about the reason he eliminated crucial and highly material information concerning medical authorization from DX MCC–2 was evasive and inadequate, and therefore is unworthy of belief. *See, e.g.,* C. 464–71, 529–33.

Mildner a memorandum regarding suspicious drug-related conduct by Harris, Evans and Eugene Hunter immediately after leaving the sixth floor visiting room. DX 32; C. 536–39.

22. In addition, there was widespread knowledge of drug use by the El Rukn witnesses at the MCC from 1989 through 1991. Other inmates housed on the sixth floor—all cooperating with the government in various cases—personally observed El Rukn witnesses use drugs, brag about using drugs, or appear to be under the influence of drugs. C. 933–38 (Evans); C. 939 (Harris); C. 941–42 (Kees); C. 745–48 (Harris); C. 743–44 (Evans); C. 1180 (Harris "and other El Rukns"); C. 955–68 (Harris and Evans); C. 893 (Harris); C. 1093–96 (Evans); DX 75 (Harris). The foregoing testimony was given by seven cooperating witnesses whose credibility the government vouched for in this and other trials.[10]

23. In the spring of 1991, Jerry Lyda of the Department of Justice's Witness Security Program told ATF Special Agent Tom O'Brien, who was assigned to this case, that he had received information that El Rukn inmate witnesses were bragging about having sex and taking illegal drugs. H. 4688, 4769. Agent O'Brien told AUSA Hogan about his conversation with Lyda. H. 4770–71.

24. Paralegal Tanya Van Blake observed Evans under the influence of drugs a number of times in late summer of 1991, often after having a contact visit with his mother or girlfriend in the United States Attorney's office. C. 1032, 1034–36.[11] Van Blake told her supervisor, paralegal Corinda Luchetta, about Evans appearing to be under the influence of drugs. C. 1032.

25. Luchetta told AUSA Hogan "possibly as early as July 1991" about Van Blake's concerns. C. 810. While awaiting the jury's verdict in Trial Two, Luchetta told Van Blake that Hogan wanted Van Blake to "leave it alone" unless she actually saw drugs passed to Evans. C. 1037.

26. Former AUSA Lawrence Rosenthal personally called DX 21 to AUSA Hogan's attention in 1989;[12] Hogan responded that [positive drug tests by El Rukn inmate witnesses] was "no problem." C. 65. AUSA Hogan flatly denies this conversation ever occurred. C. 224.

27. The court has observed the demeanor of both witnesses and their manner while testifying, and has considered their respective motives for testifying. The court is persuaded by Mr. Rosenthal's intelligence and professionalism, his ability to recall details, his care in not overextending his testimony, his candor, the circumstances under which he voluntarily came forward to testify and the consistency of his testimony with other evidence presented at the hearing. Accordingly, the court resolves the sharp conflict between the testimony of Mr. Rosenthal and AUSA Hogan in Mr. Rosenthal's favor.

28. Based upon all the facts and circumstances discussed here and elsewhere in these findings, the court concludes that AUSA Hogan personally knew that DX MCC–2 (also identified as DX Christmas 1) was a "sanitized" version of DX 21, Mildner's drug test results for the El Rukn witnesses; Hogan knew crucial information reflecting that Harris' and Evans' positive drug tests were *not* the result of medication had been eliminated. The medical authorization information contained in DX 21 was also available

---

10. One of these witnesses, Jackie Clay, claims he told AUSA Hogan four times in 1989 that Harris and Evans were taking drugs at the MCC. C. 968–72. Clay was a key government witness in the El Rukn prosecutions, although the government now challenges his credibility. Standing alone, the court would not find Clay's testimony persuasive. However, Clay's testimony is consistent in all material respects with the testimony of more reliable witnesses.

11. Despite the government's vigorous cross-examination and Ms. Van Blake's confusion about the dates, she appeared firm and certain that she observed Evans' drugged condition while Trial Two was in progress.

12. The government now concedes that the knowledge of former Acting United States Attorney Raphaelson's secretary and former AUSA Rosenthal about drug use of El Rukn witnesses at the MCC in 1989 is legally attributable to AUSA Hogan for *Brady* purposes. Government's Brief at 9, n. 3.

to other members of the prosecution team upon reasonable inquiry.[13]

29. Nevertheless, in the government's rebuttal case, AUSA Hogan called Executive Assistant Warden Robert Hafer to testify that he was a MCC unit manager in 1989; Hafer's responsibilities included administering drug tests and reviewing incident reports relating to inmate drug violations. Tr. 5759–60. Hafer further testified that when an inmate tested positive for drugs, he would check the inmate's medical records to determine whether the result was caused by medication. Tr. 5761. He also testified that Tylenol administered by the MCC contains codeine. *Id.*

30. Hafer examined DX MCC–2, Mildner's August 15, 1991 "sanitized" memorandum reflecting that Evans and Harris had tested positive for drugs in 1989; Hafer then testified that he did not recall conducting any disciplinary hearings with respect to either Evans or Harris. Tr. 5762–66. Hafer also testified that if an inmate tested positive for drugs, he [Hafer] would have conducted a disciplinary hearing. Tr. 5765. Finally, Hafer testified that Evans had serious medical problems at the time the drug tests were performed. *Id.*

31. During closing arguments, defense counsel contended that Harris and Evans were incredible and unreliable witnesses who managed to continue using narcotics while in the MCC and yet were not disciplined. Tr. 6099–6100, 6136.

32. In rebuttal, the prosecution responded:

> MR. HOGAN: Then [defense counsel] talk about the fact Henry Harris tested positive for morphine while he was at the MCC in witness protection. You heard Bob Hafer get on here, and he told you that there was never a disciplinary hearing. . . . [Defense counsel] didn't even bother to cross examine Bob Hafer about that, *because they knew that the testimony that he had given was that there was [sic] no disciplinary proceedings because there wasn't anything wrong with the fact that he had drugs in his system, because he was taking it for medication, just like Harry Evans was.*

> That's just one of the smoke screens that the defense lawyers have used to divert you from the evidence in this case.

Tr. 6170–71 (emphasis supplied).

33. The *trial* record was devoid of any evidence that, when tested for drugs at the MCC in April and May 1989, Evans received medication containing codeine and morphine or that Harris took medication containing morphine. Nor was there any good faith basis for AUSA Hogan's claim that defense counsel "knew" that the positive test results were due to medication. To the contrary, defense counsel had complained to the court at an earlier hearing that they were not provided any medical records supporting the government's conclusory assertion that the test results were due to medication. Tr. 5698–99.

34. The record conclusively establishes that the MCC, represented by an Assistant United States Attorney, did not make a good faith effort to comply with the defense trial subpoenas or with this court's two oral directives to search for MCC records responsive to the defense subpoenas.

35. The record also establishes that Ms. Christmas spoke to AUSA Hogan about the subpoenas before she told defense counsel the MCC would not comply; thereafter, Ms. Christmas told the court's clerk that the reason the MCC would not comply was because the United States Attorney had not

---

13. In contending at the *post-trial* hearing that Evans and Harris did not use medically unauthorized drugs while in custody at the MCC, the government misses the point. While there is evidence in the post-trial hearing record to support the government's contention, there is overwhelming evidence to the contrary (including Harris' own earlier admission he used heroin at the MCC in 1989). When the defendants' trial subpoenas were served and Hafer testified at Trial Two, AUSA Hogan knew that evidence existed concerning widespread illegal drug use by El Rukn witnesses, including Evans' and Harris' positive drug tests reported as medically unauthorized in DX 21. Hogan did not disclose this information. Instead, Hogan affirmatively misled the court, defense counsel and the jury.

authorized compliance.[14] Accordingly, AUSA Hogan's statement to the court that the MCC's non-compliance was based on "privilege" and failure to conform to Freedom of Information Act requirements was misleading and pretextual.

36. The evidence adduced at the hearing establishes that there were numerous routine records at the MCC in August 1991 that were not produced, even though these records were available and clearly responsive to the defense trial subpoenas. *See, e.g.,* C. 871 (urinalysis log); DX 32 (urine high risk list); DX 66 (incident report log).

37. From all the facts and circumstances, the court concludes that the failure of MCC officials to respond to the defense subpoenas, or to comply with the court's directives to search for these records, was tacitly approved—if not requested—by AUSA Hogan to conceal evidence that reflected negatively on the El Rukn inmate witnesses.

38. Moreover, Henry Harris' central file was actually at the MCC in August 1991, when Ms. Christmas and AUSA Wawzenski represented to the court that files pertaining to the disciplining of El Rukn inmate witnesses were not located at the MCC.

39. At the hearing, the government stipulated that Paul Schultz, Director of the Witness Security Program ("WitSec") for the Department of Justice, reviewed Harris' central file and concluded that Harris' file was at the MCC in August 1991. C. 697–98. *See also* C. 41, 48 (Harris' file was at MCC on June 27, 1991, according to Bureau of Prisons disciplinary hearing officer); C. 187, 498, 504 (no one asked Charles Mildner for Harris' file; Mildner, the MCC special investigative supervisor, kept Harris' central file in his office);[15] C. 148, 159–62 (Robert Hafer, executive assistant warden, admitted he did nothing to locate the subpoenaed files, even though he was present when the court directed that a thorough search be made); C. 150–52 (Harris' central file reflects that daily entries were made at the MCC beginning on May 6, 1991, including August 9 through August 15, 1991); DX Hafer 1 (warden's memorandum of November 22, 1991 regarding transmission of Harris' file from MCC to another institution).

40. It is routine MCC procedure to count central files and to account for inmates on a daily basis; this census is computerized weekly. C. 132. On August 9, 1991, MCC personnel were able to easily determine whether an inmate's central file was at the institution simply by checking the computerized census. C. 153.

41. Harris' central file contained his complete disciplinary records. C. 128. Included in Harris' disciplinary file was a statement Harris made at his hearing on June 27, 1989:

> I was working with Lt. Gibson in trying to sniff out the narcotics on the 6th floor. I was trying to see how it was getting in without getting hurt. . . . *I had to indulge in narcotics to keep the heat off me* and gain the confidence of other inmates in the unit.

DX Graham 1 (emphasis supplied).

42. In addition, the disciplinary hearing officer expressly found that the MCC hospital did not prescribe any medication that would test positive for morphine,[16] and that there was no evidence to support Harris' incredible assertion that he was using drugs to assist in an undercover MCC investigation of sixth floor inmates. *Id.*

43. During his testimony at the hearing on defendants' post-trial motion, Harris constructed a new explanation for his positive 1989 drug test for morphine; that he was

---

14. *See* Findings of Fact 2 and 6, *supra.*

15. The court resolves conflicts between the testimony of MCC personnel Charvella Christmas and Charles Mildner on this issue in Mildner's favor. Christmas' testimony was unreliable and incredible; her professed lapses of memory and lack of knowledge regarding basic Bureau of Prisons policies were astounding, particularly given her promotion a year later to unit manager. C. 88.

16. During the hearing on defendants' post-trial motion, the government stipulated that MCC hospital records confirm that Harris was not prescribed any medication that would test positive for the presence of morphine. C. 81. Thus, there was absolutely no basis in fact for AUSA Hogan's rebuttal argument that Harris' positive drug test was the result of medication. Tr. 6170–71.

"set up" by MCC personnel who put a drug in his urine sample and told him to falsely admit he had been using drugs. C. 576–77, 592. Harris then reaffirmed his Trial Two testimony that he had not used heroin since 1988. C. 595. After having observed Harris testify at length during Trial Two and again during the post-trial hearing, and considering Harris' various explanations for his drug test results, the court concludes that Harris is not a reliable witness, nor are any of his creative explanations regarding the circumstances of his positive drug test credible.

44. Similarly, after having observed Evans testify during Trial Two and again during the hearing, the court does not find credible Evans' denial that he ever used illegal narcotics while he was in federal custody, and that he had not used cocaine since 1988. C. 294, 298.

45. Harris' disciplinary file reflects that he was disciplined again at the MCC on June 28, 1991 (just days before Trial Two commenced and less than two months before the defendants' trial subpoena for disciplinary records was served on the MCC) for refusing to take a drug test. DX Graham 2. A sanction of only 15 days in disciplinary segregation was imposed, although the unit disciplinary committee recommended 30 days in disciplinary segregation and a loss of visiting rights for six months. *Id.*

46. Refusal to submit to a drug test is ranked as a severe infraction of Bureau of Prison rules. C. 10–12. According to Harris, however, even the lighter sanction was never enforced after AUSA Hogan complained to the warden that the disciplinary hearing was conducted while Harris was testifying as a witness in the trial before Judge Holderman. DX 27. Nor was Harris subjected to any further drug testing while he appeared as a witness in Trial Two.

47. Harris' disciplinary file reflects that he was also disciplined on June 28, 1991 for threatening another El Rukn witness, Derrick Kees, with bodily harm. DX Graham 2.

48. Harry Evans' disciplinary file reflects that for six months he lost MCC visiting privileges with a woman with whom he had engaged in sex in the sixth floor visiting room on April 10, 1989; in addition, Evans was placed in disciplinary segregation for 15 days. DX Evans 3. However, Evans was permitted contact visits with his mother and girlfriend in the offices of the United States Attorney. *E.g.,* C. 1034–36.

49. Executive Assistant Warden Hafer's trial testimony was misleading and inaccurate in several material respects.[17] During May and June 1989, Hafer was not the unit manager for the sixth floor of the MCC, where Henry Harris and Harry Evans (and most of the other El Rukn inmate witnesses) were housed. C. 123, 125. Hafer had no supervisory responsibilities over the sixth floor during April and May 1989, and he normally would not have even been informed if a sixth floor inmate (such as Evans and Harris) tested positive for drugs and was disciplined. C. 137–38.

50. Moreover, as Acting Warden on July 6, 1989, Hafer was notified in writing that on June 26, 1989 Henry Harris tested positive for morphine and, as a result of disciplinary proceedings, Harris was placed in disciplinary segregation for 15 days and lost his visiting privileges for six months. DX Hafer 5. Hafer now admits that he initialed the July 1989 memorandum regarding the disciplining of Harris as a result of a positive drug test for morphine; however, Hafer also testified at the hearing that he "can't say" he knew about this subject. C. 139–42. Under all the circumstances, the court finds incredible Hafer's claimed ignorance of Harris' positive drug test and the resulting disciplinary action.[18]

51. Hafer's trial testimony was calculated to mislead the jury into believing that Harris had never been disciplined for drug use. Hafer's testimony also provided a basis for AUSA Hogan to improperly attack defense counsel's credibility in his rebuttal argument

17. *See* Finding of Fact 29.

18. Hafer's bad faith is evidenced by the fact that before testifying at Trial Two, Hafer made no effort whatsoever to locate or review readily available MCC records that would have reflected drug testing results and disciplinary proceedings. C. 532.

and to falsely inform the jury that Harris had never been subjected to disciplinary proceedings because his positive drug test at the MCC was due to medication.

52. In June 1991, Harris told AUSA Hogan's paralegal, Corinda Luchetta, that he had refused to provide a urine sample. C. 721. Luchetta knew Harris had been disciplined as a result. C. 724. AUSAs Hogan and Ted Poulos, the lead El Rukn prosecutors, were aware that Harris was subjected to a disciplinary hearing that was conducted over a noon recess of Judge Holderman's trial (where Harris was testifying) on June 27, 1991. C. 864–86, 1156–58. In fact, AUSA Hogan complained to Hafer about the MCC's disciplining of Harris while Harris was a witness on the stand. C. 865, 1156–58. The court finds that the claimed failure of two experienced prosecutors to inquire about the nature of disciplinary proceedings conducted against a key government witness while he was testifying incredible.

53. Even if their professed ignorance that Harris was undergoing disciplinary proceedings for a drug infraction in June 1991 were believable, a reasonable inference could be drawn that AUSAs Hogan and Poulos deliberately avoided learning anything damaging about Harris that they would be obligated to disclose to the defense.

54. At the behest of the El Rukn witnesses on the sixth floor, AUSA Hogan frequently intervened in routine matters at the MCC: food, showers, recreation, telephone and visiting privileges. C. 473–79. In particular, Harris telephoned AUSA Hogan about his problems, no matter how petty. C. 481–83, 534. AUSA Hogan would then complain to Mildner and the warden on the El Rukns' behalf. C. 475–76.

55. After hearing AUSA Hogan's testimony and considering Hogan's relationship with Harris and other El Rukn inmate witnesses discussed elsewhere in these findings, the court finds incredible Hogan's claim that he did not know Harris had been disciplined twice for drug infractions (in 1989 and 1991) when the issue arose during Trial Two.

56. Defendants were unable to effectively challenge Hafer's false and misleading trial testimony, as well as the reliability and self-interest of Evans and Harris, and AUSA Hogan's bad faith rebuttal argument, because of the MCC's failure to comply with the defendants' trial subpoenas. In addition, AUSA Hogan's failure to disclose information and evidence responsive to the subpoenas in accordance with the government's discovery responsibilities further compounded resulting prejudice to the defense.

57. Defendants were also unable to effectively cross-examine Harris' trial testimony that he stopped using cocaine in early 1988, and he only snorted heroin "for about four, five months" thereafter (before his arrest in July 1988). Tr. 4825, 5263. Harris' trial testimony falsely suggested to the jury that he had not used drugs during his subsequent three years' incarceration while he acted as an informant and cooperated with the government in this case. In fact, Harris admitted to MCC officials in June 1989 that he had used heroin to aid in a non-existent investigation of drug use among the sixth floor inmates. DX Graham 1.[19] Nor could defendants adequately inquire into AUSA Hogan's role in the non-enforcement of disciplinary sanctions against Harris or the reason why the MCC stopped administering drug tests to Harris and Evans.

## II. Undisclosed Witness Conduct Reflecting On Credibility, Bias And Reliability

■ 58. In addition to drug testing and disciplinary records subpoenaed by the defendants, other information that potentially impacted upon the credibility, bias, self-interest and reliability of the government's witnesses was not disclosed before or during trial.

59. During Trial Two, the prosecutors and government witnesses repeatedly asserted that there was no interaction, intermingling or opportunity for collusion among the El Rukn inmate witnesses. *See, e.g.,* Tr.

---

**19.** Harris later gave paralegal Tanya Van Blake yet another incredible scenario to explain his positive drug test for morphine. Harris told Van Blake that he was "set up" by Evans who laced his soda with heroin. C. 1051–52, 1054.

4017–19, 5102–03, 5107, 5355–56, 5699–5701, 5769, 6168, 6175, 6180–81. This assertion was critical to the government's trial strategy: the testimony of the El Rukn inmate witnesses was independent and mutually corroborative, and therefore credible. Tr. 6005, 6017–19.

60. Derrick Kees and Henry Harris were involved in an assault over a chair at the MCC on May 5, 1991; Harris was disciplined as a result. DX Graham 2. It is obvious from this undisclosed incident that Kees and Harris had an opportunity to communicate and interact just two months before Trial Two began.

61. AUSA Hogan now admits that he knew that a hearing was held by MCC officials in June 1991 concerning Harris' threatening Kees, but Hogan claims that he forgot about the incident when the issue of disciplinary records was raised two months later by the defense at trial. C. 1163. The court does not find credible Hogan's professed lapse of memory concerning the disciplining of one of his key witnesses for attacking another key witness just before Trial Two began.

62. During MCC tape-recorded conversations, Evans told paralegal Luchetta that he obtained her telephone number from other inmates. DX 57; C. 801–02. In another recorded conversation, Eugene Hunter told Luchetta that Evans had just returned from a meeting with prosecutors about defendants' post-trial motion and was telling everyone what happened at the meeting. DX 58.

63. According to recent statements Eugene Hunter made to ATF agent Dan Young and AUSA John Hartman, Evans and Hawkins discussed their testimony with other witnesses every day during the El Rukn trials. DX 75. Hunter's statement is corroborated by evidence that the El Rukn inmate witnesses discussed the case and shared information before and after Trial Two. *See* Findings of Fact 62, 64, 65, 66.

64. In September 1989, Derrick Kees stole internal pre-indictment memoranda from the United States Attorney's office and disseminated these records (describing the government's theory of the case, the evidence and the prospective charges against each defendant, as well as other issues) to El Rukn inmate witnesses; the stolen documents were seized from the cells of Kees, Hunter and Hawkins at AUSA Hogan's request. C. 1172–74; DX 22, 75.[20] Some of the stolen prosecution documents were recovered; some were not. C. 450; DX 22A. AUSA Hogan never disclosed this incident to the court, the defense or the jury, nor was Kees disciplined or prosecuted for theft of government property. C. 1174. AUSA Hogan and his superiors did not consider Kees' theft and dissemination of prosecution memoranda a "big deal." C. 1176–77.

65. Paralegal Luchetta routinely gave copies of the El Rukn inmate witnesses' prior trial testimony and grand jury statements to any El Rukn witness who happened to be in the United States Attorney's office, for delivery to the MCC. C. 799. Thus, the El Rukn inmate witnesses were free to share (and compare) their prior testimony and obviously had the opportunity to exchange documents.

66. Paralegal Luchetta worked with Eugene Hunter and Henry Harris *together* in translating El Rukn coded recorded conversations. C. 718–19. This procedure was never disclosed and impeaches Harris' trial testimony that he never spoke to other witnesses at the United States Attorney's office. Tr. 5355–56.

67. The unprofessional relationship between some members of the prosecution team and the El Rukn inmate witnesses was graphically demonstrated during this hearing. Henry Harris named AUSA Hogan as beneficiary of his property, secondary only to Harris' mother. C. 609–10; DX 49. Paralegal Luchetta engaged in intimate, sexually explicit telephone conversations with Eugene Hunter. DX 39, 56; C. 1043. Paralegal Luchetta smuggled contraband (Ex–Lax) to Ervin Lee by giving it to Eugene Hunter to hide in his stockings. C. 778–79; DX 38, 55. The prosecution team gave Hunter a birth-

---

**20.** When prosecution documents were seized from Hunter, he was in the process of typing copies for further distribution. DX 22.

day cake during Trial Two. C. 791. The El Rukn witnesses gave paralegals Luchetta and Van Blake written "awards." C. 789; DX 49.

68. These realities stand in sharp contrast with the prosecution's statements to the jury in Trial Two that, "[w]e have not adopted [the El Rukn witnesses]" Tr. 276–77, 6018; ". . . they are not perfect, and we don't adopt them. We did not get in bed with them, we did not make any secret deals with them." Tr. 6201.

### III. Undisclosed Benefits

■ 69. During Trial Two, the prosecutors repeatedly asserted that the El Rukn witnesses were not receiving any benefits other than those expressly provided in their plea agreements. Tr. 295, 313, 317–18, 6177, 6189–90. So did the witnesses. Tr. 1926 (Lee); 2248–56, 2266, 2270–71 (Hawkins); 3689–90 (Evans); 5101–02 (O'Callaghan). The evidence adduced at this hearing strongly suggests otherwise.

70. According to disclosures made by the government after the conclusion of this hearing, some El Rukn inmate witnesses were furnished with food, beer, cigarettes, cash, clothing, "walkman" radios and sundry gifts. See Government's Additional Discovery filed March 12, 1993; Government's Submission of Additional Discovery filed March 31, 1993. None of these benefits was disclosed to the defense before or during Trial Two.

71. In violation of MCC regulations, members of the prosecution team granted special telephone privileges to the El Rukn witnesses. Collect calls from the MCC were routinely "patched" through the United States Attorney's office to third persons. AUSAs Hogan and Poulos and paralegals Luchetta and Van Blake, as well as their secretaries, forwarded "hundreds" of calls to outside third parties. C. 787, 1028;[21] DX 57. The government belatedly recognizes that

the forwarded telephone calls "were a benefit and should have been disclosed." Government's Brief at 43.

72. Harry Evans' girlfriend was barred from visiting him at the MCC after his 1989 discipline for engaging in sex in the visiting room; nevertheless, Evans continued to have contact visits with her in the United States Attorney's office. DX 76; C. 1034–36; H. 2202. Evans appeared to be under the influence of drugs after these visits. Id.

73. Eugene Hunter also had contact visits with his family in the prosecutors' office. DX 58.[22] In addition, Hunter was allowed to leave the MCC with ATF agents to get some "fresh air." C. 803; DX 58.

74. During Trial Two, Hunter testified that under his plea agreement, he could be sentenced to imprisonment from 20 years to life, and that he understood that prosecutors would recommend a term of at least 25 years. Tr. 4823–24. However, an intimate tape-recorded conversation between Luchetta and Hunter reveals that Hunter was told he would be free in five years. C. 789, 811; DX 39, 56.

75. AUSA Hogan made comments that led Ervin Lee and Jackie Clay to believe that he would help them reduce their sentences—beyond the terms of their plea agreements. C. 895, 902–03, 1019.

76. Due to the lack of candor by knowledgeable MCC officials, it is impossible to determine whether the United States Attorney's office influenced the non-enforcement of Henry Harris' 1989 and 1991 disciplinary sanctions. It is clear, however, that AUSA Hogan intervened regularly with MCC officials regarding complaints by El Rukn inmate witnesses [especially Harris], and that Hogan complained when Harris was disciplined while he was a witness in Judge Holderman's trial.

77. Harry Evans and Henry Harris were placed in the MCC's high risk category for

21. Even though another paralegal, Diane Russell–Coffee, warned Van Blake this practice was improper [C. 909–10], the practice was pervasive among the El Rukn prosecution team.

22. In an FBI report of interview submitted by the government several months after the hearing

on defendants' post-trial motion concluded, Hunter stated he had sexual relations with his wife during her visits while he was guarded by ATF agents in the federal building. See FBI report of interview of Eugene Hunter dated March 19, 1993.

drug abuse in May and June 1989, respectively, because of their positive drug tests. DX 32. According to MCC regulations and practices, Evans and Harris should have been tested for drugs every month for six months thereafter. C. 539. Neither of them were tested after October 1989.[23] DX Christmas 1. In the absence of *any* explanation by the MCC or the prosecution, the court infers that Evans and Harris, and other El Rukn inmate witnesses, were exempted from routine drug testing because of potential embarrassment to the El Rukn prosecution.

78. "John Doe," a non-Rukn cooperating witness whom the government stipulated was credible, regularly observed Harris, Hunter "and other government witnesses" on the floor of the MCC sixth floor visiting room engaging in sexual contact with female visitors. C. 1180. After these visits, which occurred up to four times a week, these government witnesses told "Doe" that the female visitors had provided them with drugs. *Id.* "Doe" observed Harris with a small container of cocaine on one such occasion. C. 1181.

79. After the conclusion of this hearing, the prosecution disclosed a two-year old internal ATF memorandum expressing concern about the lack of proper security measures for El Rukn inmate witnesses and their female visitors in the United States Attorney's Drug Task Force office. DX 76. The ATF agents' concerns included the following:

> El Rukin [sic] witnesses have unlimited access to telephone service in the [Drug] Task Force office on 39th floor (long distance, toll, forwarding, etc.) a dangerous practice for case security and officer safety.
>
> \*     \*     \*     \*     \*     \*
>
> El Rukin [sic] witnesses answer [Drug] Task Force office telephones on 39th floor of 230 S. Dearborn Federal building. In some instances they answer [the] phone "ATF." This practice could confuse Federal or State authorities when calling, lead-

ing them to believe the person on the other end of the line is an ATF employee. This situation may jeopardize this case, other cases, and officer safety.

> \*     \*     \*     \*     \*     \*
>
> El Rukin [sic] witnesses are allowed visits from wives on [the] 39th floor of the 230 S. Dearborn Federal building. *Wives are not checked for weapons and contraband prior to witness contact....*

DX 76 (emphasis supplied).

80. The foregoing internal ATF memorandum was sent to Arthur D. Ahrens, an ATF Group Supervisor, in early 1991. DX 78.

81. According to ATF Group Supervisor Ahrens, there had been discussions between AUSA Hogan and ATF Special Agent in Charge Daniel Hoggatt during the fall of 1990 concerning:

> ... ATF's extraordinary assistance to cooperating El Rukn members (access to phones, subsistence and related assistance to witnesses and their families, etc.).... [AUSA] *Hogan was insistent that without the continued good will of the El Rukn witnesses the government had no case.*

DX 78 (emphasis supplied).

82. ATF's "extraordinary assistance" to insure the "continued good will" of the El Rukn inmate witnesses was not disclosed to the defense before or during Trial Two.

### CONCLUSIONS OF LAW

1. The court is authorized to grant defendants a new trial "if required in the interest of justice." Fed.R.Crim.P. 33. Defendants' motion for a new trial is based upon newly discovered evidence of prosecutorial and witness misconduct. Therefore, the motion is timely. *Id.*

■ 2. The due process clause of the United States Constitution imposes an obligation on prosecutors to provide the defense with evidence favorable to the accused that is material either to guilt or to punishment.

---

**23.** As discussed above, Harris refused to submit to drug testing in June 1991; Harris was never actually disciplined for this serious infraction of MCC rules, nor was there any further effort to test him.

*Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963).

■ 3. The prosecutors' *Brady* obligation to provide favorable evidence to the defense includes evidence relating to the credibility of prosecution witnesses. *Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

■ 4. The prosecution's failure to disclose *Brady* or *Giglio* information does not automatically require a new trial. *United States v. Bagley,* 473 U.S. 667, 674, 105 S.Ct. 3375, 3379, 87 L.Ed.2d 481 (1985). A new trial is required only if the undisclosed information is material: that is, there must be a reasonable probability the jury's verdict would have been different had the *Brady* or *Giglio* information been disclosed. *Id.* at 682, 105 S.Ct. at 3383. *See also United States v. White,* 970 F.2d 328, 337 (7th Cir. 1992) (favorable evidence suppressed by prosecution must be material to support granting of new trial).

5. Defendants have established that the MCC, after consulting AUSA Hogan and acting with the legal advice of AUSA Wawzenski, failed to comply with the defense trial subpoenas and two oral directives by the court to search for and produce records relating to drug testing results and disciplinary records of the El Rukn inmate witnesses. Defendants have further established that the MCC, and the Assistant United States Attorney representing the MCC for purposes of the trial subpoenas, did not make a good faith effort to comply with the defense trial subpoenas. As a result, drug and disciplinary information material to the reliability and biases of two key government witnesses was suppressed.

■ 6. Independent of the government's legal obligation to comply with the defense trial subpoenas and the court's directives, the prosecutors had a constitutional obligation under *Brady* and *Giglio* to produce information concerning misconduct of the El Rukn inmate witnesses while in custody as protected government witnesses, as well as to disclose government supplied benefits.

■ 7. In addition, the prosecutors had a continuing obligation under the local rules of this court to permit defense counsel "to inspect, copy or photograph any evidence favorable to the defendant(s)." Rule 2.04, Criminal Rules of the United States District Court for the Northern District of Illinois.

8. The ethical responsibility of prosecutors to promptly provide favorable evidence to the defense has long been recognized by the American Bar Association:

**Standard 3–3.11. Disclosure of evidence by the prosecutor.**

(a) It is unprofessional conduct for a prosecutor intentionally to fail to make disclosure to the defense, at the earliest feasible opportunity, of the existence of evidence which tends to negate the guilt of the accused as to the offense charged or which would tend to reduce the punishment of the accused.

(b) The prosecutor should comply in good faith with discovery procedures under the applicable law.

(c) It is unprofessional conduct for a prosecutor intentionally to avoid pursuit of evidence because he or she believes it will damage the prosecution's case or aid the accused.

American Bar Association Standards for Criminal Justice (1980).

9. The Illinois Code of Professional Responsibility provides that:

**Rule 3.8. Special Responsibilities of a Prosecutor**

(b) A public prosecutor or other government lawyer in criminal litigation shall make timely disclosure to counsel for the defendant ... of the existence of evidence, known to the prosecutor or other government lawyer, that tends to negate the guilt of the accused or mitigate the degree of the offense.

Illinois Rules of Professional Conduct (1990) (amended 1991, 1992).

■ 10. By not timely disclosing the suppressed evidence, the prosecution foreclosed defense counsel from a reasonable opportunity to investigate information that reflected adversely on the reliability, biases, self-inter-

est, truthfulness and motives of the El Rukn inmate witnesses.

11. By not timely disclosing the suppressed evidence, the prosecution foreclosed defense counsel from confronting and challenging the misleading testimony of Executive Assistant Warden Hafer and of the El Rukn inmate witnesses on issues material to their reliability, biases, self-interest, truthfulness and motives during cross-examination.

12. By not timely disclosing the suppressed evidence, the prosecution foreclosed defense counsel from adequately responding to and challenging AUSA Hogan's factually false and misleading closing argument that Harris' positive drug test was due to medication, that the El Rukn inmate witnesses were reliable and independently corroborated each others' testimony and that defense counsel were merely attempting to create a diversionary "smoke screen" by attacking those witnesses.

13. With the exception of Count Eighteen, charging George Carter with distributing .36 grams of cocaine (an offense to which Carter previously pleaded guilty in state court), it was essential to the government's case that the jury perceive the El Rukn inmate witnesses as credible and reliable witnesses who independently corroborated each others' testimony. Because the suppressed evidence of misconduct and special favors bestowed by the government had a reasonable probability of adversely affecting the jury's perception of these essential witnesses, the suppressed evidence was material.[24]

14. The government contends that any knowledge possessed by MCC and law enforcement officials concerning information favorable to the defense does not confer *Brady* or *Giglio* disclosure responsibilities on "the prosecution team." Government's Brief at 4–8. The government specifically disclaims any accountability for favorable information and records "possessed only by BOP [the Bureau of Prisons], WITSEC [the Department of Justice's Witness Security Program] and cooperating witnesses at the time

of trial." *Id.* at 3. The government's contentions are unsound as a matter of fact and law.

15. The United States Attorney's office, AUSA Hogan and his paralegal assistants had personal knowledge of suppressed evidence concerning misconduct of the El Rukn inmate witnesses and of special favors accorded to them. *See* Findings of Fact 61, 64, 67, 70–71, 75–77, 81.

16. Moreover, AUSA Hogan and his staff worked closely with MCC, ATF and WITSEC personnel who had access to evidence favorable to the defense. *See, e.g.*, Findings of Fact 54, 76, 81. AUSA Hogan took a personal interest in the most mundane problems of the El Rukn inmate witnesses at the MCC. *See* Findings of Fact 54, 76. The extensive evidence not produced until (or after) the hearing on defendants' post-trial motion was readily available to AUSA Hogan and his co-prosecutors upon reasonable inquiry. *United States v. Perdomo*, 929 F.2d 967, 970–71 (3d Cir.1991) (prosecutor's failure to produce information "readily available" from local authorities deemed a *Brady* violation); *United States v. Deutsch*, 475 F.2d 55, 57 (5th Cir.1973). *Brady* places an affirmative duty of inquiry on a prosecutor, particularly when the known facts prompt further investigation. *United States v. Brooks*, 966 F.2d 1500, 1503 (D.C.Cir.1992).

17. AUSA Hogan cannot shift his discovery and disclosure responsibilities to the MCC and ATF, or to the El Rukn inmate witnesses themselves. *Carey v. Duckworth*, 738 F.2d 875, 878 (7th Cir.1984) ("a prosecutor's office cannot get around *Brady* by keeping itself ignorant, or compartmentalizing information about different aspects of a case"); *United States v. Banks*, 374 F.Supp. 321, 329–30 (D.S.D.1974). *See also United States v. Agurs*, 427 U.S. 97, 103, 96 S.Ct. 2392, 2397, 49 L.Ed.2d 342 (1976) (a prosecutor is required not only to disclose *Brady* information he knows but also information he "should have known"); Bennett L. Gershman, *Prosecutorial Misconduct* § 5.5(d) (1991) (same); John W. Hall, Jr., *Profession-*

---

**24.** As stated by AUSA Hogan during his rebuttal argument, "The key to this case is, indeed, credibility and corroboration. * * * I want you to keep in mind here, the key to this case is motivation of the witnesses that testified for the government." Tr. 6167.

*al Responsibility of the Criminal Lawyer* § 7.17 (1987) (prosecutors have a personal responsibility to search for *Brady* materials and cannot rely on investigative agencies to discharge this responsibility).

18. The government argues that the defendants could have obtained the undisclosed evidence before trial "by the exercise of reasonable diligence" and, therefore, the evidence at issue was not "suppressed." Government's Brief at 10. This argument is disingenuous, given the fact that AUSA Hogan signed a pleading more than a year before trial representing that the government was not aware of any *Brady* material, but it was "well aware of its obligations under *Brady* and will honor those obligations." Government's Consolidated Response to Defendants' Motions for Discovery, filed June 29, 1990, at 5–7.

19. Moreover, the record demonstrates that "the prosecution team" and MCC officials did all within their power to frustrate defense counsel's efforts to subpoena records concerning drug testing and the disciplining of the El Rukn inmate witnesses. And the record also demonstrates that defense counsel learned of the existence of *Brady* information after trial not from the government, but from defense counsel in the *Burnside* case. *See* Defendants' Post–Trial Motion, filed May 18, 1992. The problems leading to this motion are not the product of any lack of due diligence by court-appointed defense counsel who vigorously defended their clients, but rather are the result of the prosecution's failure to comply with basic constitutional and ethical discovery obligations.

20. The government asserts that the failure to disclose evidence concerning drug use by its witnesses was not a *Brady* violation because drug use is irrelevant to credibility. If the El Rukn inmate witnesses denied drug use (while in custody as government witnesses) during cross-examination, argues the government, the defense "would have been left with the witnesses' denials and could not have attempted to prove up the drug use with extrinsic evidence." Government's Brief at 2. The government's reasoning is flawed for several reasons.

21. The government's argument assumes that a prosecutor may sit quietly by when a cooperating witness does not respond truthfully to an impeaching question.

22. The government's argument ignores substantial evidence presented at and after the hearing that disciplinary action and basic security measures were not enforced against El Rukn inmate witnesses, thus facilitating drug and other misconduct. *See* Findings of Fact 46, 48, 67, 71–73, 76, 78–79.

23. The government's argument ignores defense counsel's right to probe into the potential bias and motive to fabricate or exaggerate caused by a reward system that includes "extraordinary assistance" not ordinarily afforded persons in custody for murder and other violent offenses, as were the El Rukn inmate witnesses. *Delaware v. Van Arsdall,* 475 U.S. 673, 680, 106 S.Ct. 1431, 1435, 89 L.Ed.2d 674 (1986) (inability to cross-examine government witness regarding bias and reliability violates defendant's rights under the confrontation clause of the Sixth Amendment); *United States v. Ray,* 731 F.2d 1361, 1365 (9th Cir.1984) (trial court's refusal to permit cross-examination of government witness' alleged post-plea drug activities constituted abuse of discretion entitling defendant to new trial).

24. Most importantly, the prosecution's failure to disclose evidence of pervasive drug and other misconduct, as well as the substantial benefits afforded the El Rukn inmate witnesses, deprived defense counsel of the opportunity to independently investigate and fully develop a defense to these serious charges. These defendants were therefore deprived of their due process right to a fair trial.

25. Contrary to the government's assertion, the suppressed evidence was not "merely cumulative impeachment." Government's Brief at 22. The extensive cross-examination of the El Rukn inmate witnesses at Trial Two focused on their criminal careers *before* they were in protective custody as government witnesses. The examination did not probe into criminal conduct *after* these essential witnesses started providing grand jury statements and were otherwise assisting the government in its preparation

of the indictment or during the ensuing trials. The suppressed evidence would have provided a fertile basis for defense counsel to probe bias and motives that were unexplored during Trial Two. It is reasonably probable that if effectively used, the suppressed evidence may have caused the jury to reject some or all of the testimony of the El Rukn inmate witnesses. *United States v. Wallach*, 935 F.2d 445, 454 (2d Cir.1991).

26. In summary, the evidence presented at and after the hearing on the defendant's post-trial motion demonstrates that the defense's allegations of misconduct "have some grounding in reality." *United States v. Bernal–Obeso*, 989 F.2d 331, 337 (9th Cir.1993). A prosecutor fails to discharge his obligations under *Giglio* unless he discloses all material information "casting a shadow on a government witness's credibility." *Id.* at 333–34. That standard was clearly not met in this case.

27. For all the foregoing reasons, a new trial is required in the interest of justice. The court need not reach the other grounds asserted in support of the new trial motion.

28. Defendants' alternative motion to dismiss the indictment on double jeopardy grounds under *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982) is without merit. There has been no showing that government misconduct "was intended to provoke the defendant(s) into moving for a mistrial." *Id.* at 679, 102 S.Ct. at 2091.

29. Nor does this court subscribe to the expansive interpretation of *Kennedy* recently given in *United States v. Wallach*, 979 F.2d 912, 916 (2d Cir.1992) (*Wallach II*) (suggesting retrial may be barred if the prosecutor engages in deliberate misconduct "to fend off [an] anticipated acquittal"). Not only is the subjective *Wallach II* standard problematic to apply, dismissal of these serious charges is not in the interest of justice. The public would be ill-served by such a drastic remedy for prosecutorial malfeasance.

### CONCLUSION

Defendants' motion to dismiss the indictment on double jeopardy grounds is denied. Defendants' alternative motion for a new trial is granted in part and denied in part. The motion for a new trial is denied as to Count Eighteen against defendant George Carter. The new trial motion is granted in all other respects.